## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **ACER LANDSCAPE SERVICES, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cv-00531** |
| | ) | **Judge Aleta A. Trauger** |
| **LASITER & LASITER INC. PC AND** | ) | |
| **MARK LASITER, INDIVIDUALLY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### <u>MEMORANDUM</u>

Currently pending in this case are (1) the Motion to Dismiss (Doc. No. 17) filed by defendants Lasiter & Lasiter Inc. PC ("Lasiter Inc.") and Mark Lasiter individually, seeking the dismissal of the original Complaint filed by plaintiff Acer Landscape Services, LLC ("Acer") for improper venue under Federal Rule of Civil Procedure 12(b)(3) or, alternatively, the transfer of this case under 28 U.S.C. § 1404(a);[1] and (2) plaintiff Acer's Motion for Leave to Amend (Doc. No. 22), which seeks leave to amend the allegations relating to the formation of the underlying contract in order to defeat transfer.

For the reasons set forth herein, the court will grant the plaintiff's Motion for Leave to Amend and deny the defendants' Motion to Dismiss under Rule 12(b)(3) and their alternative request to transfer venue.

---

[1] The Motion to Dismiss actually references 29 U.S.C. § 1402(a), rather than § 1404 (*see* Doc. No. 17, at 2), but the court presumes this to be a typographical error.

## I.  FACTS AND PROCEDURAL HISTORY

Acer is a Tennessee limited liability company based in Franklin, Tennessee. Mark Lasiter is a certified public accountant doing business in Indianapolis, Indiana, through the accounting firm Lasiter Inc., also based in Indianapolis. (Doc. No. 1 ¶¶ 5–7.) According to the plaintiff, Lasiter Inc. "solicited Acer to consider applying for a refund of previously paid employment taxes" by falsely leading it to believe that it was entitled to claim an Employee Retention Code ("ERC") credit under Section 3134 of the Internal Revenue Code.[2] (Doc. No. 1 ¶¶ 1–2, 10.) Lasiter thus induced Acer to enter into a written agreement ("Agreement") whose terms provided that Lasiter Inc. would file amended federal employment tax returns on behalf of Acer in exchange for a contingency fee in the amount of 20% of the refund received by Acer. (*See* Doc. No. 1-1, Agreement ¶ 5(a).) The Agreement was executed by Mark Lasiter on behalf of Lasiter Inc. and by Casey Winge, Acer's Chief Financial Officer ("CFO"), on behalf of Acer. (*See* Doc. No. 1-1, at 6.)

Pursuant to the Agreement, Lasiter Inc. reviewed documentation supplied by Acer, told Acer that it qualified for the ERC and a refund in the amount of $1,495,423.44, and prepared amended tax returns on behalf of Acer claiming the refund. (Doc. No. 1 ¶¶ 13–19.) Acer subsequently determined, however, based on further investigation, that it did not qualify for the ERC and has decided that it will not accept the refund to be issued by the IRS. (*Id.* ¶ 20.) It notified Lasiter Inc. of that decision and its intention to terminate the Agreement by letter dated April 3, 2023, signed by Winge. (*Id.* ¶ 21; *see also* Doc. No. 1-5.) Lasiter Inc. responded that Acer owed it the contingency fee of $299,084.68 (20% of $1,495,423.44), even if it chose not to accept the

---

[2] The court infers from these allegations that Acer did not have a working relationship with Lasiter Inc. prior to the latter's "solicitation" of Acer for purposes of filing a claim for the ERC credit.

refund. (Doc. No. 1 ¶¶ 22–23; *see also* Doc. No. 1-6.)

Based on these allegations, Acer's original Complaint asserts claims against Lasiter Inc. for (1) violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104(12); (2) a judicial declaration that Lasiter Inc. is not entitled to the $299,084.68 contingency fee it is claiming and that Acer's termination of the Agreement was proper; and (3) breach of contract, in support of which Acer specifically asserts that the Agreement "is a valid and enforceable contract." (Doc. No. 1 ¶ 34.) Acer also asserts a professional negligence claim against Lasiter Inc. and Mark Lasiter individually.

The defendants' Motion to Dismiss is premised upon the following forum selection/choice of law clause in the Agreement:

> This agreement shall be governed by and construed in accordance with the laws of the State of Indiana without regard to principles of conflict of laws. *Any lawsuit arising from or relating to this agreement shall be brought in the United States District Court for the State of Indiana.* The parties waive any objections they have to personal jurisdiction, venue, or forum *non conveniens* for any matter brought relating to this agreement.

(Doc. No. 1-1, Agreement ¶ 7 (emphasis added).)

Acer filed a Response in opposition to the Motion to Dismiss, along with its Motion for Leave to Amend the original Complaint. In support of its Response, it filed and relies upon the Declaration of Alfred Stewart, Acer's sole member (Doc. No. 23-2), and Acer's Operating Agreement (Doc. No. 23-1) to assert that CFO Casey Winge signed the Agreement with Lasiter Inc. without either actual or apparent authority to execute contracts on behalf of Acer and without Stewart's knowledge (Doc. No. 23, at 1). It argues on that basis that the contract as a whole is invalid and. therefore, that it cannot be bound by the forum selection clause. It contends that, even if the contract itself is binding, the forum selection clause is unenforceable because it would "contravene a strong public policy" of Tennessee, the forum state, embodied in the TCPA.

With the court's permission, the defendants filed a Reply (Doc. No. 27) in which they argue that the forum selection clause does not contravene any strong public policy of Tennessee; that the plaintiff does not even allege that the forum selection clause, *per se*, was obtained by fraud; and that the question of the validity of the contract as a whole should be considered by the transferee court rather than this court. It further argues that, if this court is inclined to resolve the question of the validity of the contract, the available facts show that Winge, at a minimum, had apparent authority to enter into finance-related contracts on behalf of Acer by virtue of his appointment as the company's CFO.

In its Motion for Leave to Amend, Acer asserts that the claims in the proposed Amended Complaint are not futile, because it has specifically added allegations that the Agreement is not valid because it was not signed by a person with actual or apparent authority to bind the company.[3] (Doc. No. 22; *see also* Doc. No. 22-1 ¶ 13.) The proposed Amended Complaint also continues to allege that "Acer" was induced to "authorize Lasiter Inc. to file amended federal employment tax returns and claim a refund in the amount of $1,405,423.44" (Doc. No. 22-1 ¶ 3)—*i.e.*, Acer alleges that Lasiter Inc. also induced it to enter into the Agreement. The TCPA claim is still premised upon the allegation that Lasiter Inc. "induc[ed] Acer to apply for a refund of federal employment taxes" for which it did not qualify, but the demand for a declaratory judgment has been amended to seek a declaration that the Agreement is unenforceable because it was not signed by an individual with actual or apparent authority to bind Acer, as well as, alternatively, a declaration that Acer owes Lasiter Inc. nothing, because Acer is not entitled to the refund. (*Id.* ¶¶ 27, 32, 33.)

---

[3] It continues to allege "in the alternative" that, should the Agreement be deemed enforceable, then Lasiter Inc. breached the agreement. (Doc. No. 22-1 ¶¶ 36, 38, 40.)

The defendants oppose the Motion for Leave to Amend (Doc. No. 30), and the plaintiff filed a Reply (Doc. No. 32) in further support of its motion.

## II.     MOTION FOR LEAVE TO AMEND

### A.     Legal Standard

Federal Rule of Civil Procedure 15 provides that "[a] party may amend its pleading once as a matter of course within:[4] (A) 21 days after serving it, or (B) . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). Otherwise, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The rule provides that district courts should "freely" grant a motion for leave to amend a pleading "when justice so requires." *Id.* This "mandate" flows from the principle that a plaintiff "ought to be afforded an opportunity to test [its] claim on the merits" where "the underlying facts or circumstances relied upon . . . may be a proper subject of relief." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Thus, absent "any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Leary v. Daeschner*, 349 F.3d 888, 905 (6th Cir. 2003) (quoting *Foman*, 371 U.S. at 182). A proposed amendment is futile when it would not survive a motion to dismiss under Rule 12(b)(6). *Miller v. Calhoun Cty.*, 408 F.3d 803, 817 (6th Cir. 2005); *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). Although the Sixth Circuit "reviews denials of leave to amend only for

---

[4] Rule 15(a)(1) has been amended to substitute "no later than" for "within" to measure the time allowed to amend once as a matter of course, with such amendment taking effect December 1, 2023.

abuse of discretion," its caselaw "manifests 'liberality in allowing amendments to a complaint.'" *Newberry v. Silverman*, 789 F.3d 636, 645 (6th Cir. 2015) (quoting *Janikowski v. Bendix Corp.*, 823 F.2d 945, 951 (6th Cir. 1987)).

> **B.      Analysis**

The defendants argue that the motion "is futile and made in bad faith and/or with dilatory motive, and Defendants would be prejudiced if Plaintiff is allowed to file the proposed amended complaint completely contradicting its allegations in the original complaint." (Doc. No. 30, at 5.) More specifically, they argue that the motion is an improper "attempt to delay the inevitable— dismissal or transfer to an Indiana federal court." (*Id.* at 3.) It contends that the plaintiff has admitted that Winge is its CFO and that the facts as set forth in the pleading and the documents filed by the plaintiff in opposition to the Motion to Dismiss show that Winge had actual and/or apparent authority to sign the Agreement on Acer's behalf. In a footnote, the defendants further argue that Acer is "judicially estopped" from making allegations in the proposed amendment that contradict the assertion in the original Complaint that the Agreement is a valid and binding contract. (*Id.* at 3 n.1.) The defendants also contend that they would be prejudiced by having to litigate this matter in a venue other than the one to which the parties mutually agreed. Finally, it contends that the question of the enforceability of the contract as a whole is one that should be resolved by the transferee court rather than this one.

Acer, in its Reply, argues that the proposed amendment is not futile, while also arguing that the court should not address the "merits" of the amended pleading until after granting the Motion for Leave to Amend. (Doc. No. 32, at 1, 4.) It also insists that it is not attempting to amend in bad faith or with a dilatory motive. Instead, it seeks to amend the factual allegations to conform to the evidence developed since the filing of the original pleading.

The defendants' claim of prejudice is tied to the merits of its Motion to Dismiss or transfer venue rather than the Motion for Leave to Amend *per se*. Its claim of undue delay is premised only on the fact that the proposed amendment is in reaction to its Motion to Dismiss, and its futility argument is premised on the presumption that the case should be transferred, not that the proposed Amended Complaint would be subject to dismissal under Rule 12(b)(6). And, although the plaintiff's about-face on the question of the validity of the Agreement is inherently somewhat suspect, it does not establish *per se* that the plaintiff is acting in bad faith.

The court finds, in short, that the plaintiff has not engaged in undue delay, that granting the motion would not prejudice the defendant, that the amendment is not futile, and that the granting of the motion will not moot the defendants' Motion to Dismiss. To further the interest of justice, the court will grant the Motion for Leave to Amend and proceed to rule on the Motion to Dismiss as if it were addressed to the Amended Complaint.

## III.      MOTION TO DISMISS UNDER RULE 12(b)(3)

Under Rule 12(b)(3), a defendant may move to dismiss a case for improper venue. A motion under Rule 12(b)(3) is generally governed by 28 U.S.C. § 1406(a), which provides that, if a case is filed "in the wrong division or district," the district court "shall dismiss" it, or, "if it be in the interest of justice," the court may transfer the case "to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

"Section 1406(a) and Rule 12(b)(3) allow dismissal only when venue is 'wrong' or 'improper,'" the determination of which "depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws," specifically 28 U.S.C. § 1391. *Atl. Marine Constr. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 55 (2013). That provision specifies that it governs the venue of "*all civil actions* brought in the district courts of the United States." *Id.* (quoting 28 U.S.C. § 1391(a)) (emphasis added by the Supreme Court). And, under § 1391(b), at

least as relevant here, a civil action may be brought in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." *Id.* at 55–56 (quoting § 1391(b)).

If venue in a case does not fall within § 1391(b), then it may be "improper." *Id.* at 56. However, if "a case [is] filed in a district that falls within § 1391," then venue is not "improper," and the case "may not be dismissed under . . . Rule 12(b)(3)," regardless of "[w]hether the parties entered into a contract containing a forum-selection clause." *Id.* In other words, as long as "the federal venue statutes establish that suit may be brought in a particular district, a contractual bar cannot render venue in that district 'wrong'" or "improper." *Id.* at 58.

In this case, the only basis for dismissal asserted in the defendants' motion is the forum selection clause in the Agreement. It does not argue that venue is wrong or improper under 28 U.S.C. § 1391(b). Accordingly, the Motion to Dismiss will be denied.

## IV. MOTION TO TRANSFER VENUE

### A. Legal Standards

The defendants move in the alternative for transfer of venue under the forum selection clause of the Agreement. "Although a forum-selection clause does not render venue in a court 'wrong' or 'improper' within the meaning of . . . Rule 12(b)(3), the clause may be enforced through a motion to transfer under § 1404(a)." *Atl. Marine*, 571 U.S. at 59. Section 1404(a) states that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to

any district or division to which all parties have consented."

Thus, under ordinary circumstances, a court considering a motion to transfer under § 1404(a) "must evaluate both the convenience of the parties and various public-interest considerations." *Id.* at 63. "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Id.* at 63 (internal quotation marks and citation omitted). In that context, "a district court should ordinarily transfer the case" in accordance with the forum selection clause and would only deny such a motion "under extraordinary circumstances unrelated to the convenience of the parties." *Id.* at 62; *see id.* at 63 ("[B]ecause the overarching consideration under § 1404(a) is whether a transfer would promote the interest of justice, a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." (internal quotation marks omitted)).

Generally, the only factors a court may consider in deciding whether to enforce a valid forum selection clause are the public interest factors (including such things as "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law")—but these factors will "rarely defeat transfer." *Id.* at 63 n.6 (citation omitted; alterations in the original), 64.

In addition, however, before enforcing a forum selection clause, the court must first resolve any questions that challenge whether the contract containing the forum selection agreement was validly formed. *See, e.g.*, *Langley v. Prudential Mortg. Cap. Co.*, 546 F.3d 365, 368 (6th Cir. 2008) ("Importantly, 'if no contract exists, the language of the forum-selection clause cannot logically deprive [the plaintiff] of its significant right of access to the courts of the United States.'" (quoting *Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V.*, 145 F.3d 505, 509 (2d Cir. 1998));

*see also Evolution Online Sys.*, 145 F.3d at 509 ("In the absence of a clear finding of a contract,

the district court's determination that the parties reached agreement on a forum-selection clause

was premature."); *accord In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 879 (6th

Cir. 2021) (noting, in the context of a challenge to a contract containing an arbitration agreement,[5]

in which even the question of arbitrability was delegated to the arbitrator, that, while the

enforceability and validity of the underlying contract as a whole would be for the arbitrator to

decide, the *court* "must decide challenges to the *formation or existence of an agreement in the first*

*instance* (whether it was in fact agreed to or was ever concluded)" (citations and internal quotation

marks omitted) (emphasis added)); *see also Edwards v. Allenbrooke Nursing & Rehab. Ctr., LLC*,

No. W2016-02553-COA-R3-CV, 2017 WL 4861658, at *4–5 (Tenn. Ct. App. Oct. 26, 2017)

(recognizing, in the context of a motion to compel arbitration, that the question of actual or

apparent authority to sign a contract on behalf of another was an issue going to contract formation

and holding that this issue, being one of "contract *formation*," had to be "resolved by the trial court

on the front end").[6]

---

[5] Arbitration agreements have frequently been characterized as a "type" of forum selection clause. *Harvey v. Rillema*, No. 3:23 CV 1079, 2023 WL 4847691, at *5 (N.D. Ohio July 28, 2023) (collecting cases).

[6] In the § 1404(a) context, as opposed to the arbitration context, courts have confusingly employed the term contract "validity" when they apparently mean contract "formation," perhaps because the Supreme Court's analysis in *Atlantic Marine* presumes the existence of a "valid" forum selection clause. *See Atl. Marine*, 571 U.S. at 62 ("When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause."). Ultimately, however, although *Langley* and the cases cited by the parties refer to the court's resolution of a contract's "validity," they appear to have actually held that the courts must first address the question of the contract's *existence*. *See Langley*, 546 F.3d at 368 ("Prudential is correct that contracts between the parties were formed."); *BlueDane, LLC v. Bandura Cyber, Inc.*, No. 3:20-CV-00553, 2021 WL 2869154, at *3 (M.D. Tenn. July 7, 2021) (Richardson, J.) (distinguishing between contract "validity" and "enforceability" and finding that the plaintiff's challenge to the enforceability of the contract containing the forum selection clause based on "fraud in the inducement" should be resolved by the transferee court) (citing *Walker v. AMVAC Chem. Corp.*, No. 4:17-CV-17, 2018 WL 5023417, at *4 (E.D. Tenn. Mar. 21, 2018)); *see also*

**B.      Discussion**

The plaintiff here does itself no favor by characterizing the issue before the court as one involving the enforceability of the Agreement as a whole, but it is nonetheless clear from the nature of its argument and the alleged facts that the actual issue is whether a contract between Acer and Lasiter Inc. was formed.[7] And the resolution of that question depends upon whether Acer CFO Casey Winge had actual or apparent authority to sign the Agreement on behalf of Acer.

Tennessee law governs the analysis of whether a contract was formed. *Langley*, 546 F.3d at 368. Under Tennessee law, "[t]he existence of an agency relationship is a question of fact under the circumstances of the particular case . . . and is determined by examining the agreement between the parties or the parties' actions." *Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 432 (Tenn. 2008) (internal quotation marks omitted). In Tennessee, "an agent may bind a principal to a contract if he acts within the 'scope of his actual and apparent authority.'" *Harris v. Midtown Ctr. for Health & Rehab., LLC*, No. 21-5646, 2022 WL 1261830, at *2 (6th Cir. Apr. 28, 2022) (quoting *Bells Banking Co. v. Jackson Ctr., Inc.*, 938 S.W.2d 421, 424 (Tenn. Ct. App. 1996)). The burden of proving agency is on the "party asserting the agency relationship." *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 653 (Tenn. 2009).

An agent's actual authority "consists of the powers which a principal directly confers upon an agent or causes or permits him to believe himself to possess." *Savage v. City of Memphis*, 464 S.W.3d 326, 333 (Tenn. Ct. App. 2015) (citing 2A C.J.S. Agency § 147 (1972)). "Apparent agency

---

*Walker*, 2018 WL 5023417, at *7 (holding in the § 1404(a) context that challenges to a forum selection clause premised on contract formation "ought to be litigated in the originating court").

[7] It argues that the forum selection clause was obtained by "fraud, duress, or other unconscionable means in that it is included in a contract entered into by an employee of Acer without authority to bind it" and that, as such, the Agreement is "invalid." (Doc. No. 23, at 4.) But it also cites and relies upon *Langley* and argues that Winge lacked actual or apparent authority to bind Acer to a contract. (*Id.* at 4–5.)

is essentially agency by estoppel; its creation and existence depend upon such conduct by the apparent principal as will preclude him from denying another's agency." *Boren*, 251 S.W.3d at 432 (citation omitted). "Apparent authority is established through the acts of the principal rather than those of the agent or through the perception of a third party." *Id.* at 433. Generally, to prove apparent agency, the third person proponent must establish that (1) the principal actually or negligently acquiesced in another party's exercise of authority; (2) the proponent had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the proponent relied on this apparent authority to his or her detriment. *Id.* at 432–33 (citation omitted).

In addition, a principal who ratifies an otherwise unauthorized contract will be "bound by its terms as if he or she had executed it originally." *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 270 (Tenn. 2001). "Ratification of a contract occurs when one approves, adopts, or confirms a contract previously executed" by the unauthorized other. *Id.* To ratify a contract, the principal must have "full knowledge, at the time of the ratification, of all material facts and circumstances relative to the unauthorized act or transaction." *Id.* The issue is "generally regarded as a question of fact to be determined from all of the surrounding circumstances." *Id.*

In this case, the plaintiff alleged in the original Complaint that the Agreement was a valid and binding contract (Doc. No. 1 ¶ 34), and its TCPA claim remains premised upon allegations that it was fraudulently induced to enter into the contract. The plaintiff now alleges that Winge had "no actual, apparent or implied authority to sign the [Agreement] on Acer's behalf" and that Acer's sole member and president did not authorize Winge to sign the agreement and was not aware that he had done so. (Doc. No. 22-1 ¶ 13.) Acer has also filed the Declaration of Alfred Stewart, its President and sole member, who attests that he did not authorize Winge to sign the Agreement, was not aware that he had signed the Agreement, and never "expressly or implicitly granted"

Winge "powers . . . to enter contracts on Acer's behalf." (Doc. No. 23-2 ¶ 4.) Stewart himself never communicated directly with the defendants regarding the terms of the Agreement. (*Id.*) Stewart further states that it is his "normal business practice to have counsel review legal agreements (such as the [Agreement]) before entering into them." (*Id.* ¶ 5.) He did not have the opportunity to do so in this instance, because he was unaware that Winge had signed the Agreement. (*Id.*)

Acer also submitted the Operating Agreement between Acer and Stewart, which provides that the company "may" have as officers a President or chief manager and a Secretary, and that the President "shall execute and deliver . . . contracts or other instruments . . . and otherwise act as the chief executive officer of the company." (Doc. No. 23-1 ¶ 19(A).) Acer asserts that it did nothing to hold out Winge as having authority to execute contracts on its behalf and that Stewart never did anything to ratify the Agreement, as a result of which no Agreement between Acer and Lasiter Inc. was actually formed.

In their Reply—their first opportunity to respond to the plaintiff's argument that no valid contract was formed—the defendants argue that a "full review of the facts shows that Mr. Winge did have actual or apparent authority to enter into the agreement on [Acer's] behalf." (Doc. No. 27, at 2.) It argues that (1) the Operating Agreement does not establish that Winge did *not* have authority to sign contracts on behalf of Acer; it only establishes that Stewart did have such authority; (2) Acer's creation of the role of Chief Financial Officer and appointment of Winge to that position was a "clear act of clothing Mr. Winge [with the authority] to operate on Plaintiff's behalf as to financial issues," including the Agreement at issue here; and (3) the Tennessee statute governing the management of limited liability companies provides that "authorized officers" have the authority to sign and enter into contracts on behalf of the company, under Tenn. Code Ann.

§ 48-249-402(d). (Doc. No. 27, at 6–7.)

None of the defendants' arguments is sufficient to carry their burden of establishing actual or apparent authority at this stage. As for actual authority, while it is true that the Operating Agreement does not necessarily preclude other officers from signing contracts on behalf of the company, Tennessee law provides that "LLC documents or the members, managers or directors of an LLC, *by a resolution or other writing*, may delegate rights and powers to manage and control the business and affairs of the LLC to one (1) or more officers, agents or employees, who need not be members of the LLC." Tenn. Code Ann. § 48-249-401(e) (emphasis added).[8] If such delegation has occurred, documented in writing, then the act of such officer may bind the company. Tenn. Code Ann. § 48-249-402(d). At this juncture, with no discovery having been conducted, the defendants are not in a position to offer evidence of the existence of a writing authorizing Winge, as CFO, to bind the company.

As for apparent authority, the creation of the role of CFO does not, *per se*, establish apparent authority, particularly given the clear language of Tenn. Code Ann. §§ 48-249-401(e) and 48-249-402(d). Moreover, the defendants have not pointed to the acts of anyone other than Winge himself to support the existence of apparent authority. In their Reply, the defendants assert that,

> [p]rior to Mr. Winge's execution of the engagement letter, Mr. Lasiter met with Mr. Winge via Zoom, and Mr. Winge . . . stated during that meeting that he had been in lengthy discussions with Plaintiff's chief executive officer regarding Employee Retention Tax Credits ("ERC") issues. After this meeting, Mr. Winge signed the

---

[8] The same provision states that the act of the president will bind the company, unless the president "had no authority to act for the LLC in the particular matter, and the person with whom the president was dealing knew or had notice that the president lacked authority." Tenn. Code Ann. § 48-249-402(d). In other words, an LLC's president generally has actual authority to act on behalf of the company, and, even when he does not have actual authority with respect to a particular transaction, he has apparent authority unless the third party with whom he is dealing has notice to the contrary. The same presumption does not apply to the acts of other directors.

engagement letter on Plaintiff's behalf. Defendants then sent a questionnaire to Plaintiff to determine whether Plaintiff qualified for an ERC refund, and Plaintiff completed the questionnaire and returned it to Defendants. The questionnaire was signed by Plaintiff's CFO Mr. Winge.

(*See* Doc. No. 27, at 2 (citing Doc. No. 27-1, Lasiter Decl. ¶¶ 3–5, and Doc. No. 1-2).) As set forth above, "[a]pparent authority is established through the acts of the *principal* rather than those of the agent or through the perception of a third party." *Boren*, 251 S.W.3d at 433 (emphasis added). And again, not having deposed either Winge or Stewart or obtained written discovery, the defendants have no way to challenge Stewart's assertion that he did not know about the Agreement or authorize its execution.

In a footnote in their Response to the plaintiff's Motion for Leave to Amend, the defendants briefly raise an estoppel argument, which is not supported by a developed argument or reference to any authority and is not repeated in their Reply in support of their Motion to Dismiss. The court nonetheless acknowledges that the Tennessee Supreme Court has found that one action that "clearly evidences a principal's intention to ratify an otherwise unauthorized contract is the bringing of a lawsuit to enforce the terms of that contract." *Webber*, 49 S.W.3d at 270. In this case, Acer's original Complaint, as noted above, states a breach of contract claim and actually alleges that the Agreement is a valid and binding contract. Importantly, however, Acer does not seek to recover under the contract. Rather, it seeks to repudiate it and asks the court for a declaration that it owes nothing under the contract. Likewise, while the defendants reference the fact that Stewart was copied on the email Winge sent to Mark Lasiter, to which was attached Winge's letter purporting to terminate the contract, that letter sought to terminate the contract, not adopt or enforce it. This case, therefore, is distinguishable on the facts from breach of contract cases in which a party seeks to both recover under a contract and repudiate it.

While Stewart's knowledge of the repudiation letter and the filing of the lawsuit including a breach of contract claim may qualify as circumstantial evidence of apparent authority or ratification, this evidence, standing alone is not sufficient to establish the formation of a contract—a question on which the defendants bear the burden of proof. At most, an unresolved question of fact exists as to the formation of a contract. The court finds that the parties should conduct expedited discovery on this issue to definitively resolve it at the earliest possible opportunity. For now, however, the court finds that the defendant has failed to establish that a binding contract containing a forum selection clause was formed. As a result, the defendants' alternative request to transfer venue will be denied, but without prejudice to the defendants' ability to renew it if discovery yields evidence sufficient to establish the formation of a binding contract between Acer and Lasiter Inc.

Resolution of that issue, however, would be pointless if the court were ultimately to determine that the forum selection clause were unenforceable for other reasons. In the interest of justice, the court therefore addresses the plaintiff's only other argument against enforcement of the forum selection clause, which presumes that a valid contract was formed: that enforcement of the forum selection clause would contravene strong Tennessee public policy, as embodied in a provision of the TCPA that voids contractual forum selection clauses under certain circumstances. *See* Tenn. Code Ann. § 47-18-113(b) ("Any provision in any agreement or stipulation, verbal or written, restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state with respect to any claim arising under or relating to the Tennessee Consumer Protection Act of 1977 and related acts set forth in this title is void as a matter of public policy."). This argument is not persuasive.

Other federal courts addressing the same argument have concluded that this provision of the TCPA is "procedural" and have declined to enforce it in the context of considering challenges to otherwise enforceable forum selection clauses. *See, e.g.*, *BlueDane, LLC v. Bandura Cyber, Inc.*, No. 3:20-CV-00553, 2021 WL 2869154, at *7 (M.D. Tenn. July 7, 2021) (Richardson, J.) ("[I]t is apparent that federal courts do not consider Tenn. Code Ann. § 47-18-113(b) when determining whether a transfer [under § 1404(a)] is appropriate, and Plaintiff has not pointed the Court to any case law that has done so." (collecting federal district court cases declining to consider § 47-18-113(b)).

The plaintiff, in short, offers no viable objection to the enforcement of the forum selection clause *per se*. It is therefore clear that, if the defendants are able to establish that a valid contract binding Acer was formed, then the forum selection clause would require transfer of this case to the United States District Court for the Southern District of Indiana in Indianapolis, where the defendants are located.

## V.     CONCLUSION

For the reasons set forth herein, the court will grant the plaintiff's Motion for Leave to Amend and deny the defendants' Motion to Dismiss. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge